# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| **In re Teflon Products Liability Litigation, MDL NO. 1733** | : | **CASE NO.:  4:06-cv-00099-REL-CFB** |
| | : | |
| | : | |
| HEATH HUTCHISON, an individual, | : | **(Previously 4:05-cv-1234 USDC ED MO)** |
| ASHLEY GRANAT, an individual, | : | |
| MIKE KESSLER, an individual, | : | |
| CONNIE MATTHEWS, an individual, | : | |
| TINA STOGGSDILL, an individual, and | : | |
| MARY FRITZ, an individual, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| E.I. DUPONT DE NEMOURS & COMPANY, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## SECOND AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE, EQUITABLE, NOTICE, AND MONETARY RELIEF

### (Jury Trial Demanded)

COME NOW Plaintiffs, HEATH HUTCHISON, ASHLEY GRANAT, MIKE KESSLER, CONNIE MATTHEWS, TINA STOGGSDILL, and MARY FRITZ as Class Representatives (hereinafter "Class Representatives" or "Class Representative Plaintiffs" or "Plaintiffs") on their own behalf and on behalf of all other Class Members (hereinafter "Class Members"), by and through their undersigned counsel, hereby file this Class Action Complaint for Injunctive and Monetary Relief against Defendant, E.I. DUPONT DE NEMOURS &

COMPANY ("DuPont"), and allege:

## I.   INTRODUCTION

1.      This is a class action seeking monetary and other relief arising from DuPont's deceptive and unfair trade practices in failing to disclose to the consuming public the potential or serious public health, safety and welfare issues resulting from its manufacture and sale for over fifty (50) years of a product commonly known as "Teflon."  Cooking products containing Teflon can release harmful and dangerous substances, including a chemical that has been determined to be "likely" to cause cancer in humans.

2.      DuPont manufactured and distributed Teflon when it knew, or should have known, that Teflon contains substances that were dangerous and harmful to the public that can be released when cooking products made with Teflon are used for their intended purposes.

3.      This action is brought to require DuPont (i) to pay damages to the Plaintiff Class Representatives and other Class Members who are purchasers of cooking products containing DuPont's Teflon product; (ii) to create a fund for ongoing medical monitoring of consumers who have purchased cooking products containing Teflon; (iii) to create a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon; and (iv) to require that DuPont provide a warning label on cooking products regarding the potential adverse and harmful effects of Teflon.

## II.   JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. §1332 (a)(l) and (d)(2) in that this action seeks monetary relief in excess of $5,000,000.00, exclusive of interest, costs and attorney's fees, and is between citizens of different States.

5.      Venue is appropriate in this judicial circuit pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern

District of Missouri.

### III.   REPRESENTATIVE CLASS PLAINTIFFS

6.      Plaintiff, Heath Hutchison, is a resident of Henry County, Missouri, and at all times material hereto, was a consumer of cooking products containing or made with DuPont's Teflon product.

7.      Plaintiff, Ashley Granat, is a resident of St. Louis County, Missouri, and at all times material hereto, was a consumer of cooking products containing or made with DuPont's Teflon product.

8.      Plaintiff, Mike Kessler, is a resident of St. Louis County, Missouri, and at all times material hereto, was a consumer of cooking products containing or made with DuPont's Teflon product.

9.      Plaintiff, Connie Matthews, is a resident of Jefferson County, Missouri, and at all times material hereto, was a consumer of cooking products containing or made with DuPont's Teflon product.

10.      Plaintiff, Tina Stoggsdill, is a resident of St. Charles County, Missouri, and at all times material hereto, was a consumer of cooking products containing or made with DuPont's Teflon product.

11.      Plaintiff, Mary Fritz, formerly a resident of St. Louis County, Missouri, now residing in Illinois, and at all times material hereto, was a consumer of cooking products containing or made with DuPont's Teflon product.

### IV.   DEFENDANT

12.      DuPont is a Delaware corporation. DuPont sells or distributes Teflon throughout the State of Missouri.

13.      DuPont is in the business of manufacturing and supplying Teflon for distribution,

marketing, wholesaling and retailing in various products made for consumer use.   Included among these products are housewares, household appliances, and cooking products such as pots and pans.

14.     Defendant DuPont is subject to the jurisdiction of this Court pursuant to Missouri's Long Arm Statute, Missouri Revised Statute Section 506.500, in that Defendant performed:

> (1)     the transaction of any business within this state; . . .

> (3)     the commission of a tortuous act within this state;

all as more fully alleged herein.

## V.     BACKGROUND AND GENERAL ALLEGATIONS

15.     DuPont was founded in 1802.

16.     DuPont operates in more than seventy (70) countries.

17.     Teflon was invented in 1938 at DuPont's Jackson Laboratory.

18.     Teflon is DuPont's trademarked name for the chemical polytetrafluoroethylene (PTFE).

19.     DuPont has registered the Teflon trademark in 19 countries and first began selling Teflon commercially in 1946.

20.     As DuPont proudly boasts in its Teflon website:

> Teflon is really everywhere.  Not only can you find it in your clothes and on your cookware, but you can also find it on products on almost every continent.

21.     Teflon is commonly found in "non-stick" cooking products, such as in pots and pans, stir fryers and woks, pizza pans, bread makers, cookie sheets, griddle pans and skillets, wafflers, deep fryers, crock pots, roasting pans, cake pans and molds, and other common cooking

utensils and aids.

22.     Teflon and the chemicals used in its production represent a $2 billion per year industry.

23.     DuPont nets an estimated $200 million per year from its sale of Teflon.

24.     DuPont has advertised and represented to the public that Teflon makes life easy, and reportedly has called Teflon a "housewife's best friend."

25.     DuPont claims on its Teflon website that "the Teflon brand is one of the world's most recognized and respected of all ingredient brands," and that Teflon enhances consumer recognition.

26.     During the last fifty (50) years, DuPont's scientists have studied whether products containing Teflon are safe for use by consumers.  DuPont has continually represented to consumers in public statements and documents, in press releases and on its websites that Teflon is safe for consumer use and has denied that the use of cooking products containing Teflon pose any potential harm to human health.

27.     Perflourooctonoic acid ("PFOA") is a perflourinated detergent/surfactant that is manufactured, processed, and/or distributed by DuPont in connection with its manufacture of Teflon.  PFOA is also sometimes referred to by DuPont as C-8.

28.     PFOA is the chemical used to give Teflon its "non-stickiness."

29.     PFOA is a liver toxin in animals, is biopersistent in humans and animals, and bioaccumulative in humans.

30.     PFOA is associated with other health concerns in animals, including cancer and developmental defects.

31.     PFOA is not naturally occurring but is, nonetheless, found to contaminate the blood of humans in all geographic regions of the United States.

32.     For example, a study released in 2001 by 3M Corporation found that PFOA was present in the blood of ninety six percent (96%) of the 598 children tested.  The children were located in 23 states.

33.     Studies have indicated that PFOA causes developmental toxicity and other adverse effects in animals.

34.     DuPont has conducted both animal and human studies and tests on PFOA.

35.     DuPont has knowingly represented to the general consumer market in public statements, advertisements and other writings, in press releases and on its websites, continually and within the past two years, that no risks exist from use of cooking products coated with Teflon, and has denied that the customary use of cooking products coated with Teflon risks any harm to human health.

36.     In 1981, however, 3M, a manufacturer of PFOA, advised DuPont that PFOA may cause birth defects in laboratory animals.

37.     Also in 1981, DuPont possessed a document describing the results of a blood sampling study DuPont conducted on eight (8) pregnant employees at the plant where PFOA is manufactured.  This document identified the levels of PFOA in the blood of DuPont's pregnant employees and described the status of the fetus.

38.     A purpose of DuPont's blood sample study was to monitor these pregnant employees for PFOA exposure, to monitor umbilical cord blood for the presence of PFOA, and to test the fetal blood for the presence of PFOA.

39.     The 1981 document demonstrated the presence of PFOA in the umbilical cord blood of at least one of the eight (8) DuPont employees and in the blood of another worker's fetus.  Thus, DuPont knew or should have known from this study that PFOA moved from the mother, through the placenta, to the fetus.

40.     Similarly, documents maintained by DuPont chronicaling the health of babies born to DuPont workers exposed to PFOA revealed birth defects in two (2) of the seven (7) babies.  One child had eye and tear duct defects and the second had nostril and eye defects.

41.     In 1982, DuPont reported data to the EPA regarding the transplacental movement of PFOA in rats.  The EPA considered this information to be "substantial risk data."  DuPont failed to disclose to the EPA (or to consumers), however, that it had obtained human blood sampling data in 1981 that confirmed the transplacental movement of PFOA in humans, and further failed to disclose to the EPA information it had about the occurrence of birth defects in the babies of its female workers exposed to PFOA.

42.     Upon disclosure of this additional information, the EPA found that DuPont's human blood sampling data on the transplacental movement of PFOA "reasonably supports the conclusion that PFOA presents a substantial risk of injury to human health."

43.     More specifically, the EPA reads DuPont's human blood sample data on PFOA crossing of the human placental barrier as indicating the fetuses of PFOA mothers could experience toxic effects from PFOA, including bioaccumulation and, as observed in animal tests, developmental toxicity and liver toxicity.

44.     The EPA considers DuPont's human blood sampling study, confirming transplacental migration of PFOA, "to reasonably support the conclusion of a substantial risk of injury to health or to the environment."

45.     Moreover, the EPA considers DuPont's blood sample data, confirming the transplacental movement of PFOA, to be "known toxicological information" about PFOA, of which DuPont was aware.

46.     Among other things, as a result of DuPont's failure to disclose its 1981 blood sample data to the EPA, the EPA launched an investigation into DuPont's concealment of its study information and determined that DuPont engaged in unlawful behavior by concealing the blood sample study results.

47.     DuPont's concealment of its 1981 blood sample study information protected the continued marketability of Teflon and the amount of profits received by DuPont from its sale of Teflon.  As the EPA pointedly states in its complaint against DuPont contending that DuPont violated the Federal Toxic Substances Control Act from June 1981 to March 2001 by not reporting health risks from exposure to PFOA:

> [the EPA's efforts to investigate the risks posed by PFOA] might have been more expeditious had the data on transplacental movement of the chemical in humans been submitted immediately by DuPont when DuPont obtained the information in 1981.

48.     DuPont has settled the claims brought by the EPA claiming it violated the Federal Toxic Substances Control Act.

49.     In May, 2005, however, a Federal Grand Jury from the Justice Department's Economic Crimes Section issued a subpoena to DuPont regarding DuPont's use of PFOA.

50.     There are numerous additional facts and studies, of which DuPont was aware, demonstrating that exposure to PFOA causes adverse health effects.  PFOA has been linked to cancer, organ damage, and other negative health effects in tests on laboratory animals.  For example, male and female rats and mice have developed several different kinds of tumors when exposed to PFOA.

51.     Various studies have confirmed that exposure to PFOA causes or may cause vascular disease.  For example, it is reported that workers exposed to PFOA at 3M's plant in Cottage Grove, Minnesota, demonstrated a statistically significant, elevated risk of dying from cerebrovascular disease.  Findings of vascular disease have also been reported in a study of DuPont workers exposed to PFOA.  Additionally, DuPont's study of the blood of its workers demonstrates a statistically significant correlation between cholesterol and PFOA.  Similarly, there was also a statistically significant correlation between cholesterol and PFOA found in a study of Italian workers exposed to PFOA.  Moreover, there are animal studies showing changes in blood chemistry associated with PFOA exposure that bolster these human study results.

52.     Studies have also shown that exposure to PFOA correlates to incidences of prostate cancer.  For example, workers at 3M's Cottage Grove plant exhibited a statistically significant association between the length of workplace PFOA exposure and prostate cancer mortality.  Moreover, an elevated risk of dying from prostate cancer was found among certain workers exposed to PFOA.  Additionally, workers at 3M's Decatur, Alabama, plant exhibited an increase in demand for medical care for male reproductive cancers (including prostate) compared to the general population, with the greatest increases among those workers in the long-time, high-PFOA-exposure category.

53.     There were numerous other studies DuPont knew or should have known of demonstrating many potential health risks related to exposure to PFOA.  Some of these studies include:

(a)     Two analyses of leukemia incidence were conducted from 1956-1989 showing statistically increased odds ratios for workers in DuPont's Washington Works plan from 1956-1989.  Additionally, a general mortality study found an increase in leukemia.

(b)     Workers exposed to perfluorochemicals at 3M's Decatur, Alabama, plant exhibited significantly increased numbers of episodes of care for intestinal tumors versus those not exposed occupationally.  An elevated increase of risk of dying from cancer of the large intestine was also seen in those exposed to PFOA in 3M's Cottage Grove, Minnesota, plant compared to the general population.

(c)     At 3M's Cottage Grove, Minnesota plant an elevated risk of dying from pancreatic cancer or pancreatic disease was seen among workers exposed to PFOA versus those not exposed occupationally.

(d)     At 3M's Cottage Grove, Minnesota, plant an elevated risk of dying from cancer of the testis or other male reproductive cancers was seen among workers exposed to PFOA versus those not exposed occupationally.

(e)     A 3M-sponsored animal study found a statistically significant increase in fibroademonas (mammary tumors) correlated with PFOA dose.

(f)     There are also studies that demonstrate PFOA may be related to adverse pituitary effects and immunological function.

54.     Over 40 years ago, DuPont conducted human experiments with Teflon-laced cigarettes to determine why certain workers were becoming sick on the job with a Teflon-related illness commonly called Polymer Fume Fever.  DuPont laced the cigarettes of its volunteers with Teflon and had the volunteers inhale the cigarette fumes until they became sick.  In these dosing experiments, up to 90% of the people in the highest dose group became ill for an average of nine hours, demonstrating flu-like symptoms, including chills, back ache, fever and coughing.  These symptoms are commonly linked to Polymer Fume Fever.  DuPont acknowledges that Teflon fumes can sicken people, causing Polymer Fume Fever.

55.     Moreover, aware of adverse effects to humans from inhaling heated particulates and/or fumes emitted by Teflon, DuPont required its employees to wear respirators when working with Teflon heated to 400°F (or more) while  in poorly ventilated areas.  Experiments demonstrate that when cooking in the home, the surface of a Teflon coated pan can reach this temperature within two minutes using a conventional stove top burner set on high.

56.     Reports indicate that a Teflon coated pan reached 721°F in just five minutes under the same test.  DuPont studies show that Teflon emits toxic particulates at 446°F.  At 680°F Teflon coated pans release at least six toxic gases, including two carcinogens, two global pollutants, and MFA, a chemical lethal to humans at low doses.  At temperatures that DuPont scientists claim are reached on stovetop drip pans (1000°F), non-stick coatings break down to a chemical warfare agent known as PFIB, and a chemical analog of the WWI lung-destroying gas warfare agent *phosgene.*

57.     For the past fifty years DuPont has claimed that their Teflon coatings do not emit hazardous chemicals during expected usage.  In a press release made within the past two years, DuPont wrote that "significant decomposition of the coating will occur only when temperatures exceed about 660°F (340°C).  These temperatures alone are well above the normal cooking range."  Reported tests show, however, that Teflon coated cookware exceeds these temperatures through the common act of preheating a pan on a burner set on high.  The toxic particles and gases emitted when Teflon heats, and the temperatures at which these particles and gases are first emitted, follow:

464°F – Ultrafine particulate matter:  Teflon produces very small (ultrafine) particles which cause extreme lung damage to rats within 10 minutes of exposure. Longer exposure causes death.

680°F – Tetrafluoroethylene (TFE):  The National Toxicology Program considers *tetrafluoroethylene* (TFE) to be a "reasonably anticipated" human carcinogen because it is known to cause cancer in laboratory animals.

680°F – Hexafluoropropene (HFP):  Exposure to fluorocarbons like HFP can lead to eye, nose and throat irritation; heart palpitations, irregular heart rate, headaches, light-headedness, fluid accumulation in the lung and possibly death. Long-term exposure is associated with decreased motor speed, memory and learning.  In mice and rats, inhalation of hexafluoropropene (HFP) causes kidney lesions, decreased numbers of a type of immune cell and increased urination. HFP also causes increased numbers of chromosomal abnormalities in hamster ovaries.

680°F – Difluoroacetic acid (DFA):  Kidney toxicity from DFA has been reported in rats.

680°F – Monofluoroacetic acid (MFA, fluoroacetic acid or compound 1080):  Monofluoroacetic acid is toxic.  Doses as low as 0.7 to 2.1 mg/kg can kill people.  Initially, people report nausea, vomiting, numbness, tingling, anxiety, muscle twitching, low blood pressure and blurred vision.  If exposure is high enough, people can have irregular heart rate, heart attacks and severe convulsions leading to respiratory failure.

680°F – Perfluorooctanoic acid (PFOA):  The effects of PFOA are discussed throughout this Complaint.

878°F – Silicon tetrafluoride (SiF4):  Silicon tetrafluoride is a highly toxic, corrosive gas.  In the lungs, moisture causes the silicon particles to separate, releasing toxic hydrofluoric acid and also coating the lung with silicon particles.  Inhaling hydrofluoric acid can cause eye and throat irritation, cough, difficult breathing, bluish skin color caused by lack of oxygen, lung damage and fluid accumulation in the lung.  Long term exposure can cause weight loss, decreased numbers of red and white blood cells (anemia and leucopenia), discoloration of the teeth and abnormal thickening of the bone.

887°F – Perfluoroisobutene (PFIB):  Perfluoroisobutene (PFIB) is toxic.  Inhalation can lead to fluid build up in the lung, a condition that can lead to death.  PFIB is listed in the Chemical Weapons Convention as a *Schedule 2 compound*.  PFIB is many times more toxic than phosgene, a highly toxic corrosive gas also used as a chemical weapon.

932°F – Carbonyl fluoride (COF2):  Breakdown of Teflon in the air is the major source of carbonyl fluoride exposure.  Carbonyl fluoride is the fluorine version of phosgene, a chlorinated chemical warfare agent.  Carbonyl fluoride fumes can irritate eyes, ears and nose.  More serious symptoms of exposure include chest pains, breathing difficulty, fluid accumulation in the lungs, weakness, liver damage and increased glucose levels.

932°F – Hydrogen fluoride (HF):  Hydrogen fluoride (HF) is a toxic corrosive gas, and can cause death to tissue it comes into contact with, including tissue in the lungs.  Breathing HF can cause severe lung damage, such as fluid buildup in the lungs and inflammation of lung passages.

1112°F – Trifluoroacetic acid fluoride (CF3COF):  Tifluoroacetic acid fluoride is toxic when it breaks down into hydrogen fluoride and trifluoroacetic acid.

1112°F – Octafluorocyclobutane (OFCB): Inhaling high levels of octafluorocyclobutane can cause heart beat irregularities, unconsciousness and death. People with pre-existing heart conditions may be extra vulnerable.

58.     The EPA has recently identified other significant human health concerns from exposure to PFOA.

59.     On June 27, 2005, a panel of the EPA's Science Advisory Board ("SAB") released a draft of its conclusions after reviewing the EPA's report entitled "Draft Risk Assessment of the Potential Human Health Effects Associated with Exposure to Perfluorooctanoic Acid (PFOA)."

60.     A majority of members of the EPA's SAB concluded that PFOA was likely to cause cancer in humans. The SAB stated:

> that the experimental weight of the evidence with respect to the carcinogenicity of PFOA was stronger than [previously determined by the EPA], and suggested that **PFOA is a 'likely' carcinogen in humans**. According to the EPA's Guidelines for Carcinogen Risk Assessment (also known as EPA's Cancer Guidelines), this descriptor is typically applied to agents that have tested positive in more than one species, sex, strain, site or exposure route, with or without evidence of carcinogenity in humans. (Emphasis added.)

61.     A recent Centers for Disease Control study showed that PFOA has contaminated the bloodstream of fetuses throughout the United States.

62.     DuPont executives, nonetheless, continue to claim that the customary use of Teflon in cookware products is completely safe.

## VI.     CLASS ACTION ALLEGATIONS

63.     The Representatives seek declaratory, injunctive, equitable and, in the event equitable relief is unavailable or if a substantial number of class members affirmatively elect a legal remedy, monetary relief on behalf of the classes, to adjudicate: defendant's liability for its deceptive, unfair, fraudulent, false misrepresentations and suppression or omissions of material

facts; the classes entitlement to recission, restitution, disgorgement, or monetary remedies; the provision of class notice once the parties' rights and liabilities are adjudicated by the Court; and other related forms of equitable relief.

64.     A class action is appropriate pursuant to Fed. R. Civ. P. 23 (a), 23(b)(l)(A) and (B), Rule 23 (b)(2), and 23(b)(3).

65.     The Classes that Plaintiffs represent are composed of consumers resident in the State of Missouri that have either purchased or come into ownership of cooking products that are made with or contain Teflon.

66.     The first class represented (Class I) is composed of all persons who: purchased or obtained ownership, primarily for personal, family or household purposes within the State of Missouri, one or more cooking product(s) made with or containing Teflon, and their family or household members; first discovered DuPont's misrepresentations and material omissions on or after August 9, 2000; and still owned the cooking product(s) on August 9, 2005.

67.     The second class represented (Class II) is composed of all persons who; within the State of Missouri purchased one or more cooking product(s) made with or containing Teflon, and their family or household members; first discovered DuPont's misrepresentations and material omissions on or after August 9, 2000; and still owned the cooking product(s) on August 9, 2005.

68.     The size of the each class is currently unknown but is estimated to be in excess of 1,000,000 consumers.

69.     DuPont has knowledge of all licensees authorized to manufacture or sell cookware made with or containing Teflon and the brand and model names so marketed.  Upon information and belief, and subject to information obtainable only through pretrial discovery,

DuPont licensed the use of Teflon to, among others, the following manufacturers and models of

cookware:

| MFG. | MODELS |
|---|---|
| All Clad | Emerilware<br>LTD<br>Cop-R-Chef<br>Copper-Core<br>MC2 |
| Anolon | Anolon Titanium<br>Advanced<br>Classic<br>Professional<br>Suregrip Bakeware |
| Basic Essentials | |
| Bodum | |
| Chef's Planet | Arc-42 Cookware<br>Tefmat Oven & Bake Liners |
| Circulon | Circulon Total<br>Elite<br>Premier<br>DuPont Autograph<br>Circulon Electrics |
| Crestware | Dupont "Supra Select"<br>Platinum Pro<br>Silverstone Xtra<br>Silverstone Professional |
| Cuisinart | Chef's Classic |
| DuPont | Autograph<br>Plantinum Pro<br>Platinum Select<br>Xtra<br>Classic |
| Farberware | Farberware, Inc.<br>Farberware Millennium<br>Farberware Nonstick Aluminum |

| | Restaurant Pro<br>Enhanced Nonstick Cookware<br>Select<br>Vibrance<br>Cooks Kitchen<br>Classic Series Nonstick Skillets<br>Farberware Nonstick Bakeware |
|---|---|
| GAU | |
| GSI Outdoors | Bugaboo |
| Kitchenaid | Gourmet Excellence<br>Gourmet Essentials |
| Megaware Inc. of California | Castalon<br>Castame<br>Triomphe<br>Concorde<br>Magnifica |
| Newell Rubbermaid | Calphalon |
| Royal Cougar | |
| Salton | |
| Silverstone | Culinary Colors Series<br>Nonstick Stainless Steel Series |
| T-Fal | Jamie Oliver Cookware |
| US Foodservice | Next Day Gourmet |
| Wearever | Mirro<br>Regal<br>Wearever |

70.     Excluded from the classes are the presiding District Court Judge in this matter, as well as all judges sitting on the Eighth Circuit Court of Appeals.

71.     The persons in the classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action, rather than in individual

actions, will benefit the parties and the Court.

72.     There is a well-defined commonality of interest regarding the questions of law and fact affecting the classes. Questions of law and fact common to the classes, among others, are:

a.     Whether DuPont made, approved, allowed, or ratified representations in Missouri through mass marketing and product-specific advertising that Teflon or the use of Teflon coated cooking products was safe, healthful, or that use of Teflon coated cooking products was more healthful than use of non-Teflon coated cooking products.

b.     Whether DuPont's mass marketing and product-specific advertising in Missouri that Teflon or the use of Teflon coated cooking products was safe, healthful, or that use of Teflon coated cooking products was more healthful than use of non-Teflon coated cooking products, would cause a reasonable person to believe the ordinary use of Teflon coated cooking products entailed no potential human health risk.

c.     Whether, at the time of such mass marketing and product-specific advertising in Missouri, DuPont possessed or relied upon a reasonable basis in fact (such as factual, objective, quantifiable, clinical or scientific data or other competent and reliable evidence) substantiating representations that Teflon or the use of Teflon coated cooking products was safe, healthful, and entailed no potential human health risks.

d.     Whether, at the time of such mass marketing and product-specific advertising in Missouri, DuPont knew or should have known that the release of substances during the ordinary and foreseeable use of Teflon coated cooking products could not medically or scientifically be said, to a reasonable degree of professional certainty, to entail no potential human health risks.

e.     Whether, at the time of such mass marketing and product-specific advertising in Missouri, DuPont had in its possession animal or human test data indicating potential adverse health effects from exposure to one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products.

f.     Whether, at the time of such mass marketing and product-specific advertising in Missouri, DuPont had knowledge or possession of blood sample test results of its workers, indicating transplacental movement of one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products.

g.     Whether, at the time of such mass marketing and product-specific advertising in Missouri, DuPont had in its possession data regarding deformities suffered by the children of female DuPont employees exposed to one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products.

h.     Whether, at the time of such mass marketing and product-specific advertising in Missouri, DuPont had in its possession information demonstrating or tending to demonstrate that one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products does present potential risk of injury to human health.

i.     Whether, during the time of such mass marketing and product-specific advertising in Missouri, DuPont had been notified by the EPA that evidence of transplacental movement of one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products in laboratory rats was "substantial risk data" of a potential human health risk.

j.     Whether, at the time of such mass marketing and product-specific

advertising in Missouri, DuPont disclosed, in a fashion sufficiently specific so as to leave no reasonable probability of misunderstanding, clearly, conspicuously and in close proximity to its affirmative representations, any and all material exclusions, reservations, limitations, modifications, or conditions relevant to the affirmative representations that Teflon or the use of Teflon coated cooking products was safe, healthful, or more healthful than use of non-Teflon coated cooking products.

k.      Whether DuPont's mass marketing and product-specific advertising in Missouri affirmatively represented that Teflon or the use of Teflon coated cooking products was safe, healthful, or more healthful than use of non-Teflon coated cooking products, when DuPont knew or should have known those representations would justifiably induce class members to choose, retain, and/or continue use of Teflon coated cookware, or to refrain from choosing and using other cookware, due to DuPont's failure to disclose - knowingly, with scienter, and/or through a failure to exercise reasonable care - what it actually knew, and actually did not know, about the truth or falsity of those representations, thus, rendering those representations untrue, deceptive, or misleading, to the injury of class members.

l.      Whether, at the time of such mass marketing and product-specific advertising in Missouri, DuPont knew or should have known that fumes from heated Teflon coated cooking products can sicken people.

m.      Whether DuPont had in its possession information demonstrating, or tending to demonstrate, that fumes from Teflon coated cooking products can sicken people, that DuPont failed to disclose to the consuming public.

n.      Whether the representations in DuPont's mass marketing and product specific advertising in Missouri, that Teflon, or the use of Teflon coated cooking products, was safe, healthful, or more healthful than use of non-Teflon coated cooking products, were qualified

or unqualified.

   o.  Whether the class representatives's claims are sufficiently similar to the claims of prospective class members.

   p.  Whether, at the time of DuPont's mass marketing and product specific advertising in Missouri, DuPont had material information about the possible human health risks of heating Teflon coated cooking products that it concealed, omitted, or suppressed.

   q.  The types of equitable relief to which the Class Members may be entitled for deceptive, misleading, or fraudulent business practices or the concealment, suppresion, or omission of material facts in connection with the advertisement or sale of merchandise under Missouri Revised Statute § 407.020.

  73.  These common questions of law and fact are governed by the laws of the State of Missouri, where Defendant has engaged in its wrongful conduct, and predominate over questions that affect only individual Class Members.

  74.  The claims of the Class Representative Plaintiffs are typical of those of the Classes.  The Class Representative Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent them. The Class Representative Plaintiffs anticipate no difficulty in the management of this litigation as a Class Action.  Accordingly, the Class Representative Plaintiffs are adequate representatives of the Classes and will fairly and adequately protect the interests of the Classes.

  75.  A class action is the best available method for the fair and efficient adjudication of this controversy. The Members of the Class are so numerous that the joinder of all Members is impracticable, if not impossible.  Because the harm suffered by individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation makes it impractical for Members of the Class to seek redress individually for the wrongful

conduct alleged herein.  Should each individual Member of the Class be required to bring

separate actions, the resulting multiplicity of lawsuits would cause undue hardship and expense

on the Court and on the litigants. The prosecution of separate actions would also create a risk of

inconsistent rulings which might be dispositive of the interest of other Class Members who are

not parties to the adjudications and/or may substantially impede their ability to protect their

interests.

76.     To the extent such conditions exist, all conditions precedent to the maintenance of

this action have been performed, have occurred, or have otherwise been waived.

**COUNT I**

**UNFAIR AND DECEPTIVE TRADE PRACTICES**

77.     Plaintiffs re-allege and reincorporate the allegations contained in paragraphs 1

through 76 above as if fully set forth herein.

78.     This claim is brought on behalf of the Class I Members, pursuant to Missouri

Revised Statute § 407.020 (hereinafter "§ 407.020"), commonly referred to as the Merchandising

Practices Act, which makes it an unlawful practice to use deception, fraud, false pretenses, false

promises, misrepresentations, or unfair practices, or to conceal, suppress, or omit any material

fact in connection with the sale or advertisement of any merchandise in trade or commerce.

79.     The Class Representative Plaintiffs and the members of Class I are Consumers

within the definition of § 407.020.

80.     DuPont has engaged in deceptive and unfair acts or practices in the conduct of its

business, which acts are unlawful pursuant to § 407.020.

81.     DuPont has committed a willful violation of § 407.020.

82.     DuPont knew or should have known that products containing Teflon presented

potential health risks to consumers.

83.     DuPont concealed and omitted in its marketing and sale of Teflon products to Missouri consumers that products containing Teflon contained potential health risks when used in a reasonably foreseeable manner.

84.     DuPont failed to disclose to consumers the information it knew relating to the adverse effects of particles and chemicals off-gassed from Teflon demonstrated in animal studies, the blood sample data it compiled regarding transplacental movement of chemicals contained in Teflon and the information it knew of regarding the occurrence of birth defects in the children of its female workers.

85.     DuPont knew that exposure to PFOA has caused injuries to humans and animals but concealed its knowledge of the potential dangers associated with the use of Teflon from the public and from the EPA in order to deceive customers into using and purchasing products containing Teflon.

86.     DuPont has stated repeatedly that both Teflon and PFOA are safe products for consumers' use without the necessary scientific and medical evidence to support these claims.

87.     DuPont has recently expressed an intention to replace PFOA in the production of Teflon by late 2006.   This fact implies that DuPont is aware of the dangers that may be associated with the use of cooking products that have been produced with Teflon and with PFOA.

88.     As a direct and proximate result of the foregoing, the Class Representative Plaintiffs and members of Class I have suffered a cognizable injury in violation of § 407.020, including the purchase, retention and continued use of Teflon cookware products..

**WHEREFORE,** the Class Representative Plaintiffs, on behalf of themselves and the members of Class I, request that the Court:  (1) enter a declaration of their right to set aside those transactions of Teflon cookware and an order permitting Plaintiffs the right to elect recission,

resitution or, alternatively; (2) enter judgment for money damages against DuPont; (3) order the creation of a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon; (4) order a warning label on cooking products containing Teflon regarding the potential adverse and harmful effects of using Teflon coated cooking products; (5) award punitive damages in the event money damages are awarded; (6) award interest, costs, and attorneys' fees;  and (7) award of any other equitable relief that this Court deems just and appropriate.

## COUNT II

## UNJUST ENRICHMENT

89.     Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 88 above as if fully set forth herein.

90.     Plaintiffs and the members of Class II purchased or otherwise acquired cooking products made with or containing Teflon, without understanding the true nature of the health hazards associated with Teflon's use.

91.     DuPont knew but failed to disclose the true facts concerning the potential adverse health risks associated with Teflon, which health risks rendered Teflon unfit and unsafe when sold and used as intended by Plaintiffs and the members of Class II.

92.     As a result of DuPont's failure to disclose the true facts concerning the adverse health risks associated with Teflon, the Plaintiffs and the members of Class II purchased or otherwise acquired Teflon cooking products that they would not have otherwise purchased or acquired, or paid a price higher than they would have otherwise paid for such products.

93.     As a consequence of DuPont's conduct, substantial monetary benefits were conferred upon DuPont, which benefits DuPont knew of and appreciated, and accepted and

retained.

94.     By virtue of the foregoing, DuPont was unjustly enriched at the expense of Plaintiffs and the other members of the Class in an amount yet to be determined.

95.     Because of DuPont's conduct, it is against equity and good conscience to permit DuPont to retain the monetary value of the Teflon products which were purchased or otherwise acquired by the Plaintiffs and the members of Class II.

96.     As a direct result of DuPont's wrongdoing, the Plaintiffs and the members of Class II have been damaged, and, consequently, DuPont should disgorge the monetary value of the Teflon products which were sold to or otherwise acquired by the Plaintiffs and the members of Class II.

**WHEREFORE,** the Class II Representative Plaintiffs, on behalf of themselves and the members of Class II, request:  (1) a declaration of their right to elect to set aside those transactions of Teflon cookware and an order requiring DuPont to make restitution and disgorgement of the revenues therefrom, or alternatively, judgment for damages in an amount to be determined at trial; (2) punitive damages in the event money damages are awarded; (3) interest and costs associated with bringing this action; (4) attorneys fees; (5) notice notifying; and (6) retention of jurisdiction thereafter for Class II Members who seek actual and punitive damages.

## COUNT III

## CLAIM FOR FRAUDULENT INDUCEMENT, DECEIT, AND FRAUDULENT CONCEALMENT

97.     Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 96 above, as if fully set forth herein.

98.     Missouri Courts have recognized fraudulent non-disclosure claims under Section 551 of the Restatement (Second) of Torts. *See Kesselring v. St. Louis Group, Inc., 74 S.W.3d 809*.

99.     Consequently, at all relevant times in Missouri, a party who directly benefits from and knowingly participates in a transaction is under a duty to speak, and therefore liable for nondisclosure if that party fails to exercise reasonable care to disclose a material fact, the concealment of which may justifiably induce another party to act or refrain from acting, and/or the non-disclosing party knows that the failure to disclose such information will render untrue or misleading that party's prior statement or representation.

100.    When misrepresentations and/or omissions occur in the context of extensive advertising or a common design of routine representations, class-wide exposure and reliance need not be proven directly, but may be inferred or presumed from the circumstantial evidence of widespread dissemination.

101.    As explained with particularity above, at all relevant times DuPont directly benefited from and knowingly participated in the mass marketing and product-specific advertising for sale in Missouri of Teflon and Teflon coated cooking products.

102.    Though mass marketing and product-specific advertising, DuPont promoted the purchase and use of Teflon coated cooking products as safe, healthful, or more healthful than use of non-Teflon coated cooking products.

103.    The intent of DuPont's mass marketing, representations, assurances and product-specific advertising was to induce the purchase of Teflon coated cooking products in Missouri for cooking use by emphasizing qualities and characteristics thereof material to the decisions of

Plaintiffs and other class members as to the purchase or retention of Teflon coated cooking products for use over brands or types of cookware without a Teflon coating.

104.    Representations of the safety and healthfulness for cooking use, whether in absolute or comparative terms, of Teflon and Teflon coated cooking products are material representations on which Plaintiffs and class members justifiably relied in deciding to purchase or retain Teflon coated cooking products for use over brands or types of cookware without a Teflon coating.

105.    DuPont's mass marketing and product-specific advertising, including the assurances described above, made to induce the purchase and use of Teflon coated cooking products in Missouri, were such to cause Class II, the Plaintiffs, and any reasonable person to justifiably believe the ordinary use of Teflon coated cooking products entailed no potential human health risk.

106.    At all relevant times, DuPont knew or should have known that the ordinary use of Teflon coated cooking products can cause the release of substances which cannot be said, to a reasonable degree of medical or scientific certainty, to pose no potential human health risk.

107.    At all relevant times, DuPont knew or should have known that animal or human test data in its possession indicated potential adverse health effects from exposure to one or more of the chemicals that can be released during ordinary use of Teflon coated cooking products.

108.    At all relevant times, DuPont had in its possession blood sample test results of its workers, indicating transplacental movement of one or more of the chemicals that can be released during the ordinary and foreseeable use of Teflon coated cooking products.

109.    At all relevant times, DuPont had in its possession data regarding deformities suffered by the children of female DuPont employees exposed to one or more of the chemicals that can be released during the ordinary and foreseeable use of Teflon coated cooking products.

110.    At all relevant times, DuPont had in its possession information demonstrating, or tending to demonstrate, that one or more of the chemicals that can be released during the ordinary and foreseeable use of Teflon coated cooking products presented potential risks of injury to human health.

111.    At all relevant times, DuPont had been notified by the EPA that evidence of transplacental movement of one or more of the chemicals that can be released during ordinary use of Teflon coated cooking products in laboratory rats was "substantial risk data" of a potential human health risk.

112.    At all relevant times, DuPont knew or should have known that fumes from heated Teflon coated cooking products can sicken people.

113.    DuPont's knowing failure to disclose and knowing decision and/or to conceal the above health-related information induced Plaintiffs and other Class II members to purchase, retain and continue use of Teflon coated cooking products, and DuPont knew that full, timely, and complete disclosure would negatively impact sales of Teflon cookware and the profits from its sale of Teflon for such purposes.

114.    DuPont knew or should have known that its failure to disclose and/or concealing the above health-related information to Plaintiffs and the other Class II members made DuPont's mass marketing and product-specific representations of the safety and healthfulness of Teflon and Teflon-coated cooking products for ordinary and foreseeable use whether absolute or comparative in nature untrue or misleading.

115.    DuPont therefore had a duty to speak, which it breached negligently, recklessly, knowingly, intentionally, and/or with malice by concealing and/or not disclosing all material facts known or in its possession.

116.    As the proximate result of DuPont's fraudulent inducement, deceit, and fraudulent concealment, Plaintiffs and the other class members suffered injury, including but not limited to the purchase, retention for use, and continued use of Teflon coated cooking products.

WHEREFORE, Plaintiffs and the members of Class II request:  (1) a declaration of their right to elect to set aside those transactions and an order requiring DuPont to make restitution and disgorgement of the costs and profits thereof and incident thereto and; (2) notice notifying; (3) costs associated with bringing this action, (4) reasonable attorney fees, and (5) retention of jurisdiction thereafter for Class II members who elect to seek actual and punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request trial by jury of all issues so triable as a matter of law.

BLUMENFELD, KAPLAN & SANDWEISS, P.C.
*Counsel for Plaintiffs*
168 N. Meramec Ave., Ste. 400
St. Louis, Missouri  63105
Telephone:    (314) 863-0800
Facsimile:    (314) 863-9388


KLUGER, PERETZ, KAPLAN & BERLIN, P.L.
*Counsel for Plaintiffs*
Miami Center, 17th Floor
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone:    (305) 379-9000
Facsimile:    (305) 379-3428

Kimberley K. Baer      PK0014675
Steven P. Wandro      PK0008439
WANDRO, BAER & APPEL, P.C.
*Counsel for Plaintiffs*
2501 Grand Avenue, Suite B
Des Moines, Iowa 50312
Telephone:      515/281-1475
Facsimile:      515/281-1474


By:____s/ Kimberley K. Baer_____
　　　　Kimberley K. Baer, Esq.


## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via Electronic Mail and a true and correct copy of the Certificate of Service (only) furnished via U.S. Mail to: **Adam L. Hoeflich, Esq.**, ([adam.hoeflich@bartlit-beck.com](mailto:adam.hoeflich@bartlit-beck.com)) Bartlit Beck Herman Palenchar & Scott LLP, 54 W. Hubbard Street, Chicago, IL 60610l; **Robert Fanter, Esq.**, ([fanter@whitfieldlaw.com](mailto:fanter@whitfieldlaw.com)) Whitfield & Eddy 317 Sixth Avenue, Suite 1200, Des Moines, Iowa 50309 and **John Sherk, Esq.**, ([jsherk@shb.com](mailto:jsherk@shb.com)) Shook Hardy & Bacon LLP, 2555 Grand Blvd., Kansas City, MO 64108  this 8th day  of May 2006.


By:_____s/ Kimberley K. Baer_____
　　　　Kimberley K. Baer, Esq.